POWELL, Adm'r, et al. v. HUGHES et al.

No. 29954. Sept. 9, 1941.

*116 P. 2d 896.*

N. E. McNeill, of Tulsa, for plaintiffs in error.

Geo. A. Fitzsimmons, of Oklahoma City, for defendants in error.

RILEY, J. This is an action commenced by Floyd Powell, administrator with foreign will annexed of the estate of W. M. King, deceased, and Rethea King Nealy and Maggie Powell, devisees under the will, to set aside and cancel a mineral deed, purporting to have been executed by W. M. King, in his lifetime, conveying an undivided one-eighth mineral interest in and to 80 acres of land situated in Logan county, Okla., and to set aside a deed, thereafter executed by Hughes to M. E. Fruin, conveying an undivided one-sixteenth interest in the oil and gas rights in and under said 80 acres of land.

The deed from King to Hughes is dated July 31, 1937. The deed from Hughes to Fruin is dated May 27, 1938.

As grounds for cancellation of said deeds, plaintiffs allege that at the time the deed from King to Hughes was signed and delivered, King was wholly incapacitated and was entirely incapable of understanding or comprehending the nature of said transaction or the nature or effect of said mineral deed; that said property, at the time, was highly valuable for prospective oil and gas purposes, which fact was concealed by the grantee and his agent, who procured the deed, and was unknown to King because he was incapable of knowing or understanding the facts; that said deed was without consideration, or that the consideration paid was grossly inadequate, and by reason thereof the deed was wholly void and conveyed no title to Hughes, and therefore Hughes had no title to convey to Fruin.

Defendant Hughes answered separately by general and specific denial, and alleged that King understood the transaction.

Defendant Fruin answered by general denial, and pleaded that he was an innocent purchaser for value without notice of any defect in Hughes' title, and asked that his title be quieted. Judgment or decree was for defendants, and plaintiffs appeal.

The principal contention is that the findings and judgment of the trial court are against the clear weight of the evidence. At the time the deed to Hughes was executed, King was about 63 years of age. About the year 1932 he was suffering from Berger's disease, which is not defined in the record, resulting in the amputation of his left leg above the knee. In 1934 he suffered a stroke which partially paralyzed his right side. In 1936 he suffered a second stroke, after which his entire right side, right leg, and right arm were completely paralyzed. Thereafter he was physically helpless and was confined to his bed, or a homemade wheel chair, until his death in June, 1938. For some years before

his death, King lived in Dallas, Tex., with his half sister.

Hughes lived in Oklahoma City. Shortly before July 21, 1937, one Robert Finch, who stated he was in the real estate brokerage business, had the deed in question prepared in Oklahoma City, naming W. Combs Hughes as grantee, with a consideration stated of one and no/100 dollars ($1.00) and other good and valuable consideration and went to the home of King in Dallas, Tex. He took with him a number of travelers' checks of $20 denomination each. He talked to King two hours concerning the deed. On the next day he went back and procured the deed. He testified that he bought the travelers' checks and paid his own money therefor, and that he gave King nine $20 travelers' checks and $20 in cash. He turned the deed over to Hughes, and testified that he paid his own expenses and that Hughes paid him $200 for the deed and that he lost his time and expenses. Hughes never met King and had no personal knowledge of King's physical or mental condition. Fruin never saw or knew King. A number of witnesses testified concerning the physical and mental condition of King.

There is and can be no doubt but that King was physically helpless for more than a year prior to the execution of the deed. The evidence as to his mental condition is in conflict. A number of lay witnesses testified concerning King's mental condition. Some of them were interested witnesses, and so far as lay witnesses are concerned, without going into detail as to their evidence, it may be said that the evidence is fairly well balanced.

But, considering the evidence of the lay witnesses in connection with the testimony of the medical or expert witnesses, it is apparent that the finding and judgment of the trial court are clearly against the weight of the evidence.

Doctor J. H. McCracken, Jr., a regularly licensed physician and surgeon, testified that he performed the operation amputating King's leg in 1931, and treated him from that time to the date of his death in 1938. He testified at great length as to how King's afflictions had affected him physically and mentally. As to his condition after 1936, his testimony was:

"I would see William just occasionally to more or less satisfy them, and finally, I would say, along, oh, I believe it was a couple of years before he died, he never seemed to know whether I came or not; and I couldn't ever get any sign of recognition on his part that I was even there, but I would check his pulse, and listen to his heart to satisfy them, and that was about all I did, maybe sent him a little medicine, too—I did, I sent him a little medicine, I recall now, I sent him a little medicine which I thought might keep him from having these little convulsions, spasms, or seizures which he had. . . . Q. During the time, say from 1936 to 1938, at the time of the death, what would you say about his mental condition? A. Well, mentally his mind had suffered just as his body had suffered in this catastrophy which was a circulatory collapse; that is what it was, and it was a hemorrhage in his brain, and there were times when I thought maybe William understood a little better than I thought he did, but I never could positively determine it. Q. You never could determine whether he could understand what you said to him? A. No, he could not talk, he would mumble, and he, frankly, for a couple of years, before William died, he was just living, and that is about all. William, if he was capable of asking for things, or realizing his own needs, I would be surprised, I really would. I don't think that William ever did, he would have a little convulsion, seizure, it just added and added to the thing until he was in an almost a comatose state, and I had no satisfaction whatsoever, so far as getting any subjective information from William, and he would not talk."

Dr. N. L. Cornwell, a practicing physician who lived at Coyle, Okla., saw King a number of times while he would be visiting his mother, who lived near Coyle. He saw King less frequently than Dr. McCracken. He testified in part:

"Q. Do you remember about when was the last time you saw him? A. About

1936 or 1937. Q. At that time what was his condition, physically? A. Very bad. very bad. Q. What was he suffering, what affliction had been— A. Well, he was depressed generally, physically, and had no control of himself, had to be helped, and possibly half of the time or more he acted doty and indifferent, not interested in anything, hardly himself. ... Q. Could he carry on a conversation? A. No, sir, not the last time I saw him he couldn't carry on an intelligent conversation, at all. He broke down and cried because of the fact that he couldn't. Lamented and spoke of his condition, that he couldn't. His memory was failing, he couldn't remember. Q. What would you say as to his mental condition at that time, his capacity to understand a business transaction regarding the sale or disposition of his property? A. Well, I would say that he wasn't competent in any sense to perform business of any kind."

Considering the opportunity Dr. Mc-Cracken had to observe and note the mental condition of King through a period of more than four years, and that so far as the record shows, Dr. Mc-Cracken had no interest in the outcome of this litigation, there seems to be no escape from the conclusion that at the time the deed in question was procured, and for a long time prior thereto, King's mind had suffered a collapse just as his body.

On the other hand, Finch testified that he talked with King concerning the deal and that he had never talked with a more intelligent man. That he talked with as much intelligence and as much reasonableness as any man. But Finch was an interested witness.

On the question of consideration, there is conflict even in defendants' evidence as to how much Finch paid King. Finch testified positively that he paid King $200; that he gave King nine travelers' checks of $20 each and the balance in cash.

H. S. Thompson, a witness for defendants, testified that he was present and was called as a witness to the delivering of the consideration and that he saw the checks counted out and that the amount paid was $125.

All the other witnesses who testified as to the amount paid, stated the amount as not more than $125. It is apparent that Finch was mistaken, at least as to the amount actually paid.

The evidence is also in conflict as to the value, at the time, of the mineral rights in the land. It may be noted, however, that Fruin testified that in May, 1938, he paid Hughes $375 for an undivided one-sixteenth interest in the royalty under the 80 acres. That is, he paid $375 for one-half the interest that Hughes had.

There was evidence tending to show the value of the royalty interest in land, in the vicinity at the time, as from $10 to $60 or $65 per acre. It is safe to say from the record that it was reasonably worth at least $37.50 per acre, or $375. So, if $125 was all Finch paid, he got the deed for about one-third its actual value. If he paid $200, then he got it for slightly less than one-half its actual value.

In Graff v. Holliday, 172 Okla. 503, 45 P. 2d 1065, it is held:

"It may be stated as settled law that where there is a great weakness of mind in a person executing a conveyance of land, arising from age, sickness, and any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party or his representatives or heirs, interfere and set the conveyance aside."

The record herein shows a much stronger case in favor of plaintiffs than was shown in Graff v. Holliday, supra. Plaintiffs were clearly entitled to recover as to defendant Hughes. As to defendant Fruin, it appears that he paid the fair value for his conveyance and bought without any notice whatever of any infirmity in the title.

In Graff v. Holliday, supra, it is pointed out that section 9403, O. S. 1931, 15 Okla. Stat. Ann. § 23, provides:

" 'A conveyance or other contract of a person of unsound mind, but not en-

tirely without understanding, made before his incapacity has been judicially determined, is subject to rescission without prejudice to the rights of third persons, as provided in the article on extinction of contract.' "

Thereunder the rights of defendant Fruin should be protected.

The judgment of the trial court, insofar as it sustains the deed of the defendant Hughes, is reversed. That part of the judgment which affirms the title of defendant Fruin to an undivided one-sixteenth interest in the mineral rights in and under said 80 acres of land is affirmed.

WELCH, C. J., CORN, V. C. J., and BAYLESS and HURST, JJ., concur.