ANSELMAN, Adm'r, v. OKLAHOMA CITY UNIVERSITY.

No. 31995. May 21, 1946.

Rehearing Denied July 9, 1946.

Application for Leave to File Second Petition for Rehearing Denied Oct. 8, 1946.

*172 P. 2d 782.*

Tom W. Garrett, of Oklahoma City, for plaintiff in error.

Embry, Johnson, Crowe, Tolbert & Shelton, V. P. Crowe, and C. Harold Thweatt, all of Oklahoma City, for defendant in error.

DAVISON, J. Many years ago, Irminda and Sophia Banning, sisters, came to Oklahoma City, took up their abode together, went to work, never married, and accumulated sizable estates in Oklahoma City real estate. In 1931 they made mutual identical wills providing that in the event of the death of either, the decedent's property should go to the survivor. On February 28, 1942, Sophia died and all her interest in the property passed under her will to Irminda. Soon after the death of Sophia, Fred Anselman, their grand-nephew, came to Oklahoma City and thereafter made his home with Irminda, who was then nearing 70 years of age. Before many months had elapsed she was talking of relieving herself of the burden of looking after the property and contributing it to the use and benefit of some worthy cause. The first institution she mentioned as a possible donee of such a gift was Phillips University, a school sponsored and supported by the Christian Church, at Enid, Okla. Later, after talking with Mr. D. W. Hogan, president of the City National Bank & Trust Company, where she did her banking, she finaly decided upon Oklahoma City University, a Methodist school, as the donee for such a gift. After several conferences concerning the matter, in early April, 1943, she directed Mr. Roy C. Lytle, an Oklahoma City attorney, to draw up a contract between herself and Oklahoma City University in which it was agreed that she would convey to said institution various pieces of her real estate described therein for the purpose of activating a fund to be established in memory of herself and her deceased sister, to be known as the "Banning Scholarship Foundation". Among other things, the contract also provided that the deed and instruments to effect such conveyance were to be placed in the above-named bank, as escrow agent, to be delivered to the University upon the bank being furnished with satisfactory proof that the University had raised in money or obtained pledges of not less than $100,000 and that the Oklahoma Methodist Conference had made certain commitments, but that delivery of the conveyance to the University should not be delayed later than December 31, 1943, in any event. In the contract the University agreed, among other things, to accept such conveyance, to pay the 1943 taxes on the property; to keep it insured and free from mortgage or encumbrance and to pay Miss Banning out of the income therefrom during the rest of her life the sum of $500 per month, or a sum substantially its equivalent in purchasing power, to be deter-

mined on the basis of the Dow-Jones indices.

On Wednesday, April 14, 1943, before the final draft of the contract was ready for signing, Miss Banning was stricken with a heart attack and taken to Wesley Hospital. On Thursday afternoon, April 15th, Mr. Lytle brought the contract to the hospital, where she signed it, and the following Saturday afternoon, Hogan brought the deed, which she likewise signed in her hospital bed. She died there the following day, Sunday, April 18, 1943.

Thereafter, Fred Anselman was appointed administrator of Miss Banning's estate and in said capacity commenced this action against Oklahoma City University to set aside said deed and contract, alleging in general substance that due to the circumstances of the case, Miss Banning's execution of said instruments was ineffective to make them valid and binding. By answer and cross-petition the defendant University denied the administrator's charges and asked, among other things, that its title to the property be quieted against any and all claims thereto by said administrator and/or any and all persons claiming by, through or under him. Upon a trial to the court, judgment was for the defendant quieting its title and refusing cancellation of the deed and contract on the basis of specific findings to the effect that at the time Miss Banning executed the deed and contract she was not incapacitated by age, infirmity, or illness from entering into a valid and binding contract and that she was not acting under undue influence.

In discussing the questions involved herein, we will henceforth refer to Fred Anselman, administrator, as plaintiff, and Oklahoma City University as defendant, or the University, and sometimes to Irminda Banning as the deceased or decedent.

Plaintiff argues his assignments of error under four propositions, the first of which is as follows: "Deeds to real property must be delivered and accepted during the lifetime of the gran-

tor." In support of this proposition plaintiff argues that in order for the agreement set forth in the written contract to be enforceable, it must have been accepted by the University and Miss Banning's deed have been delivered to said University during her lifetime, citing authorities to the effect that to make a valid gift, there must be a delivery of the thing given and acceptance by the donee; that a gift cannot be made to take effect in the future; that a promise to make a gift, being without consideration, is unenforceable, and that a deed does not take effect until delivered. On the hypothesis that the gift was never completed hinges also counsel's argument that the evidence of Miss Banning's previous intention to make it was inadmissible. In our opinion such arguments do not deserve serious consideration, for they concern a matter which does not appear to have been in issue at the trial. As to the University's acceptance of the contract, this was done when its president, Dr. C. Q. Smith, pursuant to authorization by the board of trustees of said institution, affixed his signature to the contract in his official capacity, and said signature was duly attested by the secretary of the University. Plaintiff attached a copy of the contract to its petition showing that said president and secretary signed it on April 16th (prior to Miss Banning's death). In its answer, the defendant admitted the execution of said contract and in his reply plaintiff denied that there was a good and valuable consideration for it, but did not question that it was duly executed as it purported to be. It is elementary that a litigant may not change the theory of his case on appeal, and that ordinarily this court will not decide an issue not raised at the trial. Small v. Shull, 190 Okla. 418, 124 P. 2d 381; McCann v. City of Enid, 192 Okla. 495, 137 P. 2d 586; Butterick v. Molen, 192 Okla. 602, 138 P. 2d 89. Plaintiff's contention that Miss Banning's deed was not delivered to the University before her death is based solely on the fact that after signing the deed, she handed it to D. W. Hogan, and the suggestion that he was

her agent for delivery of the deed, and that with her death, such agency terminated. Such a suggestion or assumption is contrary to the facts. It is true that after Miss Banning went to the hospital she sent word through Mr. Hogan to her attorney that she wanted the contract brought to her hospital room, but there is no proof that when Hogan later took the deed there for signing, he was acting in any capacity other than his official one, as president of the bank which had been designated in the contract as escrow holder for the parties thereto. After Miss Banning signed the deed and Hogan received it back from her, it was then in escrow and Miss Banning's subsequent death had no effect on the passage of title to the property therein described. See 19 Am. Jur. 448, par. 27.

No useful purpose would be served by setting forth verbatim the formal propositions under which plaintiff's counsel has grouped the remainder of his argument, and we feel that clarity and brevity will be served by dealing directly with the arguments, irrespective of the titles or headings under which they appear.

Plaintiff infers that Miss Banning had not had private and independent counsel nor an opportunity to think the matter over before executing the contract. He charges that Mr. Lytle was not representing Miss Banning and infers that actually he was representing either Hogan's bank or the University instead of Miss Banning. As counsel's charges have no direct proof to support them, but are gathered from a few incidental circumstances extracted or severed from their surroundings in undisputed facts which reflect their true significance, it will be necessary to fill in the brief outline of facts already set forth herein with other undisputed evidence not heretofore mentioned.

For years before the death of either of them, the Banning sisters had transacted their banking business at the City National Bank & Trust Company, where they often owed some indebtedness in connection with the acquisition and improvement of their properties. After Sophia's death, when Irminda inherited the task of managing the property alone, she would visit the bank on an average of once or twice a week to deposit rentals from the property and transact other banking business in connection therewith. On many of these occasions, Howard Bozarth, who was assistant cashier and had charge of loans and discounts, waited upon her. On more than one of her visits to the bank she discussed with him and sought his friendly advice on the disposition of her estate. On one such occasion she told him she had not been particularly well, that she had been having trouble getting what she considered a fair tax assessment on some of her property and that it was getting burdensome for her to handle, and that she had been giving some thought to deeding it to some institution or organization that would use its benefits for a worthy cause. During some of their previous conversations Miss Banning had told Bozarth that she was opposed to leaving considerable property or money to heirs who had had nothing to do with its accumulation, for she had observed that often estates so left were soon dissipated. At Miss Banning's request, Bozarth promised to give the matter some thought and let her have the benefit of his ideas. Later, when she again brought the matter up and mentioned that she had been thinking of giving her property to Phillips University at Enid, Bozarth suggested that she seek the counsel of Mr. Hogan, the bank's president, and when she accepted this suggestion, he made her an appointment with Mr. Hogan in the early part of March, 1943. When she saw Hogan and told him she was considering the gift to Phillips University on condition that she receive an income from it, he told her that he would consider it "a safer investment to put it with Oklahoma City University," citing the size of Oklahoma City, of the Methodist Church in Oklahoma, and said institution's better prospects of a large future patronage, as reasons for his opinion.

This suggestion apparently appealed to Miss Banning, for she asked Hogan how she would go about such a transaction and he told her to see the president of the University, Dr. C. Q. Smith. On March 24th, Miss Banning telephoned Dr. Smith and informed him what she was thinking of doing and asked him to come to her home the next day to discuss the matter. At that time she told Dr. Smith how she had spent most of her life teaching, that she and her sister had accumulated considerable property after retirement from their professions; that she was interested in trying to perpetuate that for which she had given her life; that she had more property than she ought to try to take care of; that she had thought of giving her money or at least some of it to Phillips University because she was a member of the Christian Church, but that after Mr. Hogan had suggested that she leave her money in Oklahoma City where she had made it and she got to thinking how she had been reared a Methodist, and had an uncle or grandfather who was a Methodist minister, she decided it would be more appropriate to make a gift to the Methodist Church. Upon her request for suggestions for the use of her property in establishing a memorial, Smith promised to study the matter, submit her a memorandum and discuss it further with her at a later date. On March 29th, Dr. Smith submitted the memorandum. When she again saw Mr. Hogan at the bank she told him she was favorably impressed with Dr. Smith and his ability and fairness in outlining a plan. During the course of the conversation, Hogan informed Miss Banning that there was a mortgage on the University of $300,000 and that at least $100,000 of that should be paid by popular subscription or otherwise, and he suggested that she employ a lawyer to look after her interests in the matter. On March 31st, she again had Dr. Smith come to her home to discuss his plan for the memorial, at which time Fred Anselman was present.

According to Dr. Smith's testimony, the following conversation was had in his conference with Miss Banning:

"A. She said to me she had received the memorandum and looked it over, was impressed by it, and she said, 'I feel like it is fair, it is concise, it really proposes something I am interested in.' I said to her, 'Miss Banning, if you are interested in this, in discussing this, I would like first of all to offer you this suggestion: Now, this is your property, you have a right to do as you please with it now. You ought to have, if you don't have at this time, you ought to have legal counsel. We have a lawyer for our Board of Trustees, and I suggest you employ an attorney if you are interested in this memorandum I have given you, to defend your rights and to see you get what you want'."

Then, according to Smith, he and Miss Banning went ahead to discuss the various features of the plan outlined in his memorandum of the 29th, the first point of which was set forth therein as follows: "The donor should be given absolute comfort and financial security." As to that point Smith testified the conversation was as follows:

". . . I said, 'What I mean by that, Miss Banning, is that it may be we could work out something by which you would have a more comfortable living and relieve you of all of your worry of handling this business. We are probably situated much better for handling it, and too, you would like to be relieved from some of that worry, and we could handle it in such a way under a community plan by which we would take all of the responsibility of administering your investments and pay you a stipulated sum each month.' I said, 'That form would have to be agreed to by you, and there is where I think you should have, if you are not fully decided already, you should have counsel to help you work that out. She said, 'I think that is fair enough.' "

Toward the end of their conference, the conversation was as follows:

"I said, 'Miss Banning, suppose you think of it in this light: First, that we will circularize every high school in the state . . . and that we also stimulate the Methodist churches of this state to

do something for the University by your handsome gift,' and I had proposed in the memorandum that we would raise— that we would offer to raise $100,000 and cause the Oklahoma Methodist Conference, the legal name of the East Oklahoma Conference, the West Oklahoma Conference, comprising approximately 600 Methodist churches, to take an offering once a year for the University. I explained to her this we were doing now, but I said, 'I will cause— we will agree to cause to be voted in the next annual conference the continuation of that program, that is, the annual program under the law of our church. It will have to be voted annually.' I explained that to her and then I said to her, 'Now, Miss Banning, I am going to ask you again, if you have not appointed an attorney that you do so, and if it is satisfactory with you I would like to bring our attorney out to talk to you when you are ready.' I said, 'Do you have an attorney?' She said, 'No I don't. . . .

" 'I talked some with Mr. Hogan since you were here, and he has suggested two or three law firms,' and she named two firms, one of them was the Keaton, Wells & Johnston firm with special reference to Mr. Lytle. . . .

". . . she said she felt he was a younger man in the firm and would probably be able to look after it longer than some older attorney might . . .' "

Dr. Smith again talked with Miss Banning on April 1st when he telephoned and told Miss Banning that he felt like they had made enough progress that he would like to put down in writing his understanding of their conversations thus far and send it to her. She agreed that he might do that and he thereupon wrote and sent her said letter. The next day Miss Banning phoned Dr. Smith, told him she had received the letter and agreed to telephone him when it would be convenient to discuss the matter further. In keeping with this promise she telephoned him April 5th and told him she would see him April 6th and that he might bring the University's attorney, Mr. Gibbens, with him. Dr. Smith and Mr. Gibbens then went to Miss Banning's home on the 6th and they all discussed Smith's letter and the plans for the memorial, at which time Mr. Anselman was present intermittently. Before he and Smith left, Mr. Gibbens asked Miss Banning to prepare him a list of the properties she wished to include in the transaction, and she promised to furnish it. He also told Miss Banning that she should procure an attorney to look after her interests in the matter, and after a brief discussion of several attorneys, Miss Banning asked Dr. Smith to contact Mr. Lytle and find out how much he would charge to look after the matter for her. That afternoon Dr. Smith went to Mr. Lytle's office, became acquainted with him, and told him what Miss Banning wanted. That evening, he telephoned Miss Banning and reported to her that Mr. Lytle had indicated a willingness to discuss the matter of his employment with her but that it would be necessary for her to make her own arrangements with him. The next day Dr. Smith called at Miss Banning's home for the list of properties she had promised to furnish and then delivered the list to Mr. Gibbens. On April 9th, Miss Banning telephoned Dr. Smith and told him she had been studying the University's proposal and also told him that she had decided to use Mr. Lytle as her attorney. On April 10th she had a conference with Mr. Lytle at his office, lasting two and one-half hours. Then on April 13th she telephoned Dr. Smith to meet her, Hogan, and Lytle in Lytle's office that afternoon. That conference lasted two hours, and during it each point in the plan for the memorial was discussed separately and at length, Mr. Lytle making a memorandum as to the agreement that was reached on all points. That night he drew the contract in accordance with his memorandum and also drew a will for Miss Banning as she had requested that afternoon.

After her heart attack and removal to Wesley Hospital April 14th, Miss Banning telephoned Mr. Hogan on April 15th, asking him if he knew whether or not the contract was ready, and if so, she would like for him to come to the

hospital and have the contract brought there so she could look it over and sign it. Hogan then apprised Mr. Lytle of Miss Banning's wishes and the two met in her room, where the contract was read to and signed by her in the presence of several witnesses. The next day the contract was signed by Dr. Smith on behalf of the University. The following afternoon, Saturday, April 17th, Hogan took the deed to the hospital, saw Fred Anselman there and asked him to go to Miss Banning's room and see if it would be agreeable to bring the deed in so she could look it over and sign. Anselman entered Miss Banning's room and came back out, inviting Mr. Hogan in, then the two went in, Mr. Hogan read it aloud to her, made a change she requested, and Miss Banning signed and acknowledged it. He then left the hospital with the deed, went to his home, and on Monday morning when he went to his bank, turned it over to a Mr. Blair in charge of the trust department there, to be held in escrow.

From the foregoing rather detailed description of the events leading up to the execution of the contract and deed, it will be seen that same was not an act Miss Banning was "rushed" into, but instead was the culmination of weeks of thorough study and reflection during which she had the opportunity of considering the transaction from every angle that occurred to her mind as well as to the minds of some very able, sincere, and friendly advisors. Not only did she have the advice of those we have mentioned, but the record further shows that approximately a month before Miss Banning's heart attack and death she talked about the project on three different occasions with J. D. Alexander, vice-president of Oklahoma City Federal Savings & Loan Association, who was one of the attesting witnesses to the will she made in 1931; and had apparently been a confidant and advisor through her many years of doing business with his company. Mr. Alexander's testimony discloses that he also advised Miss Banning that it would be better to turn her property over to Oklahoma City University, after she had informed him she was thinking of giving a portion of it to Phillips University. In a later conversation with this witness, Miss Banning revealed her final decision to convey it to Oklahoma City University. The record further shows that on April 2, 1943, she consulted Mr. J. M. Ashton, research director for the Oklahoma State Chamber of Commerce, about the plan for establishing the university foundation. It was further revealed that on April 8, 1943, Mr. R. O. Pyle of a local real estate firm telephoned Miss Banning to see if she would sell one of her buildings and at what price. She told him she valued it at $35,000, but she wanted to talk to "someone else" before she gave him any decision on a sale of the property. The next day she phoned Dr. Smith to ascertain whether the University would rather have the proceeds of such a sale or the rentals from the building and Smith told her he thought it would be better for the University to have the rental income. Smith's statement as to this is corroborated by Pyle, who also testified that the next time he telephoned her she gave him Smith's decision as conclusive on the matter of the prospective sale.

In March, 1943, Miss Banning had Vernon Mock sent to her home to talk to him about making an insurance survey of her property. Before the end of their first conversation, she began to talk about Oklahoma City University and told him she had been considering the transfer of the property to said institution. Then after Mock had made the survey and reported to her on it April 4th or 5th, she told him not to type up his report, that she had been "talking to the University" and had tentatively agreed on the transfer. Later, when Mock telephoned Miss Banning, she told him the deal had been made, that she was going down town in the next day or so to sign the papers, and that he would have to talk to the University about the insurance.

Thus it will be seen from the events

which transpired many days before Miss Banning was stricken, that she had thoroughly considered the advisability of transferring the property in question to defendant and had carefully studied the plan by which this was to be done, and considered "the deal made" before ever going to the hospital and at a time when there can be little, if any, question as to her physical or mental capacity. Plaintiff sought to create some doubt as to the latter by the testimony of two women who had been tenants of Miss Banning and two others who had known her for varying periods before her death. We have carefully examined this testimony. It shows merely that Miss Banning may have been somewhat erratic, eccentric and emotionally unstable and during the latter part of her life began to show signs of old age and senility such as childishness and forgetfulness. Such evidence in itself is insufficient proof of mental incapacity (Amos et al. v. Fish et al., 193 Okla. 406, 144, P. 2d 967; Scott v. Scott, 131 Okla. 144, 268 P. 245) and certainly cannot be said to outweigh the abundance of evidence to the contrary. A number of business and professional men who had dealings with Miss Banning, or opportunities of observing her during the period immediately before her heart attack, testified that she was mentally competent and some expressed the opinion that she had above the average intellect in business matters.

Plaintiff's counsel says that Miss Banning's attorney, Mr. Lytle, never advised Miss Banning of the prudence of conveying her property away from her control. Because of plaintiff's objection to the admission of evidence as to what transpired when Miss Banning had her first conference with Mr. Lytle, the record does not reveal what advice he gave her, but it does not appear that she was then seeking advice as to the prudence of the gift. As hereinbefore shown, it appears that with the information and advice she already had, her mind was made up as to that, and she was merely seeking advice and assistance from Lytle as to the best way or legal vehicle for putting her previous decision into effect.

Further than the mere fact that Miss Banning signed the contract within 24 hours after she became ill and the deed less than 12 hours before her death, counsel cites three particular circumstances to support his charge that Lytle and Hogan neglected the duties of their fiduciary relationships with her for the interests of the bank or University. One of these is the circumstances that at the time Miss Banning engaged him, Lytle had for some time represented the bank. There is no proof whatsoever that this fact in any way affected Lytle's loyalty or advice to, or representation of, Miss Banning in the matter in question.

Another circumstance relied on by plaintiff pertaining to the interest of Lytle in the matter is stated substantially as follows: In the conference he had with Miss Banning, Dr. Smith and Mr. Hogan the day before her heart attack, Lytle told them that he would prepare the contract and submit copies of it to Hogan and Smith and after he got their suggestions, he would "sit down with Miss Banning" and go over it with her, "having the advantage of their suggestions at that time." The evidence shows that Lytle's promise was fulfilled in that the furnished Hogan and Smith the copies on Wednesday and had their suggestions on Thursday when he took the contract to Miss Banning's hospital room. Counsel makes much of the fact that these copies were furnished to Hogan and Smith but not to Miss Banning and that thereafter Lytle had no private consultation with her. On the basis of plaintiff's testimony alone, it is asserted that when Lytle took the completed contract to the hospital he merely handed it to her and instructed her to sign it "Irminda E. Banning," inferring that nothing more was said or done, and that Miss Banning had no opportunity to know or

understand the document's contents. Such a statement ignores the undisputed facts related by witnesses in a position to know them. Anselman's testimony discloses that he did not enter Miss Banning's hospital room until sometime after Lytle went in with the contract. According to the witnesses in the room all the time Lytle was there, he carefully read the contract aloud to Miss Banning and his reading was interspersed with a discussion between them of various provisions therein.

Plaintiff's counsel also points out that Hogan became a member of the board of trustees shortly after the transaction. It does not appear, however, that the advice or assistance that Hogan gave in the matter was impelled by anything more than a friendly and unselfish desire to serve Miss Banning as a customer of his bank, and there is no evidence that he had any intention or desire to add such a position to his then existing responsibilities. What little evidence there is of any partisanship on the part of Mr. Hogan indicates he was more probably motivated by concern that Miss Banning's property be protected against obligations of the University and constitute a permanent memorial than by any ulterior design or selfish consideration. Whatever else might be said of any possible motives Mr. Hogan may have had in the matter, perhaps the strongest statement that could be truthfully made is that he was motivated by the spirit of civic pride in his community.

A correct conclusion as to Miss Banning's mental faculties on the respective dates of the execution of the contract and deed is not wholly dependent upon the recorded opinions of the witnesses, the preponderance of which, including those of Doctors Wann Langston and George N. Barry, heart specialists, was to the effect that the patient's illness and treatment with drugs did not prevent her from knowing and understanding what she was doing at the time. Whatever may have been her mental condition at other times while she was in the hospital when, according to some of plaintiff's witnesses, she may have been temporarily or momentarily irrational, the statements she is said to have made on particular occasions most material to the question indicate she was not only lucid but mentally alert and possessed of her characteristic business astuteness. For instance, according to the undisputed testimony of Mr. Hogan, corroborated generally by the testimony of Mrs. L. E. Hayes (an old friend of Miss Banning's and an entirely disinterested witness) this is what occurred when he took the deed to her hospital room:

"A. Well, I took the deed out of my pocket and I said, 'Are you feeling well enough for me to read this deed?' She said, 'Oh, yes, let us get it done before any company comes in, if we can.' So, I sat up at the south window, her bed was right close to it, and I read the deed over to her carefully.

"Q. Did you read it out loud to her?

"A. Read it out loud, read these properties through, and when I got down to the clause 'To have and to hold said described premises unto the said party of the second part, its successors and assigns, forever free and clear and discharged of and from all former grants, charges, taxes'—she stopped me at 'taxes' and she said, 'It is the contract that the University is to pay the taxes, and that should not be in that deed.' I said, 'You are quite right I remember that myself,' and I took my fountain pen and wrote in 'except mortgages and taxes of record' and then after the words 'of whatsoever nature' I wrote 'except as above noted' with a pen, and that is here, I recognize that as my handwriting."

Plaintiff's counsel also infers that the contract in evidence is so long and technical, yet so ambiguous and uncertain, that it would require many days of study by a person of superior intellect to recognize its full import or to see its various implications and deficiencies. In support of such argument he says the contract leaves in doubt the date when

the University is to assume control of the properties and begin collecting the income accruing therefrom. We have examined the contract and for obvious reasons express no opinion on the construction or interpretation to be given it. However, we do not think it is so long, technical, indefinite or ambiguous as to be incomprehensible to Miss Banning concerning the matters she was interested in, especially in view of her previous study and information with reference thereto. There are indications in the record that Miss Banning was not particular about just when the University assumed control of the property after the execution of the contract. As hereinbefore shown, it was to receive title thereto not later than December 31, 1943.

We are not impressed by any of the legal authorities cited in support of plaintiff's position. In all of the cited cases there was some factual element or elements such as fraud, intimidation, or undue influence, not present here. In all, the person signing the instrument set aside was in some way unduly influenced, defrauded, or overreached. There was a dominion over the will of the contractor or testator exercised by one or more other parties which caused him to enter into an arrangement he would not have agreed to of his own free will and accord or with independent advice or counsel. One or two cases are to the effect that such counsel or advice should not only be independent but private, and plaintiff's attorney emphasizes the fact that in Mr. Lytle's last meeting with Miss Banning (the one in her hospital room) there were persons present other than the patient and her attorney. Under the facts of this case, such cases are not applicable and counsel has failed to offer any convincing reason why, in order for the contract to be valid and binding, this last conference should also have been private, despite the abundance of private and independent advice Miss Banning had already obtained.

Plaintiff also points out the great difference in the monthly stipend the University was to pay Miss Banning under the contract and the value of the property it was to receive from her. It is said that the annual income to be paid her is less than her ad valorem and income taxes would have been had she retained the real estate. Whether or not the transaction was a wise or unwise one for the grantor or donor from a purely financial standpoint cannot command its usual consideration in a case of this character. And in such a case, the question is not so much whether the arrangement constitutes an unreasonable or unnatural disposition, as whether the conveyor was capable of knowing and understanding what disposition he or she desired to make of the property, and does the conveyance accord with that desire. These things must be remembered in attempting the application of a rule such as plaintiff urges to the effect that where one of the contracting parties is beset with infirmities likely to affect his mental processes, the burden of proof is on the other party to prove that his contractor appreciated the consequences of signing the contract. Assuming without deciding that such a rule is strictly applicable here, we think defendant's evidence sufficient to discharge such burden.

It is unfortunate, because of its probable influence in bringing about this litigation, that the transaction in question could not have been closed before Miss Banning had the heart attack, but the dispatch that was employed afterward, under the circumstances of this case, is no reflection on any of the parties criticized by plaintiff's counsel for it. In taking the contract and deed to the hospital for signature so soon before Miss Banning's death, Lytle and Hogan were but complying with her wishes.

During the trial of the case plaintiff called five witnesses, including two nurses and one of the attending physi-

cians, who testified that in their opinion Miss Banning was not mentally competent to execute the deed and contract. This testimony conflicted with the testimony of witnesses for defendant.

This being an action of equitable cognizance, it is our duty to carefully weigh the evidence and determine whether the judgment is clearly against the weight thereof. Hogan v. Leeper, 37 Okla. 655, 133 P. 190, 47 L.R.A. (N.S.) 475. In weighing this evidence we have kept in mind the opportunity the witnesses had to know the facts concerning which they testified and on which they based their opinions, as well as the interest they have in the outcome of the case.

Though it may seem harsh to relatives who might otherwise inherit the property, we are convinced that the disposition of it effected by the contract and deed in question is the one its deceased former owner not only desired but was determined to make. Blood relatives, close or distant, cannot be deemed the most natural or exclusive objects of the bounty of all decedents under all circumstances. To set aside the conveyance in question would not merely be allowing the very persistence of Irminda Banning's efforts in the face of illness and probable death to defeat her noble purpose and cherished hope of leaving on earth a permanent contribution to higher learning as a life memorial, it would be an abuse of this court's appellate powers in view of the record in this case.

As we have found no valid ground for reversal in any of the arguments presented, and, manifestly, the trial court's judgment cannot be said to be clearly against the weight of the evidence, said judgment must stand. It is therefore the order of this court that the district court's judgment be affirmed.

GIBSON, C.J., and BAYLESS, WELCH, CORN, and ARNOLD, JJ., concur. HURST, V.C.J., and RILEY and OSBORN, JJ., dissent.

———

HURST, V.C.J. (dissenting). I am not unmindful of the great benefit this gift of some $200,000 will be to a worthy educational institution and to the young people whose education may be advanced by its provisions, but our decision should be based upon the law and the evidence, which, in my opinion, do not sustain the judgment of the trial court.

The important facts to keep in mind are these: At the time the contract and deed were executed, Miss Banning was on her deathbed; she was then 70 years of age; she executed the contract about 24 hours after she suffered a severe heart attack and the deed about 12 hours prior to her death; she was in great pain or in a stupor practically all the time after she was stricken; none of the three doctors expected her to recover; the details of the transaction had not been fully agreed upon before she was stricken, but a contract was to be drawn and submitted to her for study; it is not clear that she had finally decided to make the gift to the University, since she told witnesses during the week preceding her last illness that Mr. Hogan and Dr. Smith were trying to get her to make the gift but that she had worked too hard to give her property away and she intended to see that Fred Anselman was well provided for; in 1934 the two sisters made reciprocal wills under which each devised and bequeathed to the other all her property, and each will provided that in event the other died prior to the death of testatrix the property should go to certain named relatives; neither will was ever revoked and both were admitted to probate so that the last survivor was at least under a moral obligation to let the property go according to the will; the contract is long, covering twelve pages of the record, and containing 15 numbered paragraphs, exclusive of the 14 paragraphs of the description; she had not

seen the contract prior to its presentation to her for execution, and had not had an opportunity to study it; the contract was intricate and involved and contained several technical provisions that it would have taken a capable lawyer some time to fully understand; by the contract and deed she stripped herself of all her real estate, of the value of some $200,000, except the home where she resided, and which she and her sister had spent their lifetimes accumulating; the transfer was without consideration and was not to a close relative; it does not appear that she asked any questions as to the meaning of any of the provisions of the contract; she was suffering from shock and was in a stupor and under the influence of sedatives and opiates most of the time after she was stricken and, as Dr. Bradley, her attending physician, testified, she signed the contract and deed automatically; she went into a stupor at short intervals; her speech came haltingly; she could not give the nurse a history of her case; much haste was exercised in procuring her signature to the instruments, evidently because it was thought that she was likely to die at any time; she did not have the benefit of competent independent advice, in private, at the time she execuated said instruments, though she had on Saturday prior to her being stricken conferred privately with a competent attorney, but the details were not finally agreed upon at that conference; she was frequently delirious as shown by the fact that she seemed to think her deceased sister, Sophia, was still living and wondered if she would approve of the transfer to the University, and she imagined, so Swisher testified, that apples were on the dresser about noon Saturday when there were none there. At the time she was told that Hogan was there Thursday afternoon with the contract she said: "If I could just have some rest, but people keep bothering me." Thursday night she complained to the nurse, Miss Hull: "If they would go away and leave me alone I could get some quiet

and rest and would be all right." Dr. Langston, a witness for the defendant, testified that it "certainly would exhaust her to do a lot of talking and thinking and so forth, would certainly be exhausting" and his written report recited: "She is critically ill and it is very problematical as to the outcome."

The record discloses that after Miss Banning suffered the heart attack Wednesday afternoon and before she was taken to the hospital about 9 o'clock that night, she was given two doses of morphine of $\frac{1}{4}$ grain each; that while she was in the hospital she was given three doses of morphine of $\frac{1}{8}$ grain each, four doses of dilaudid of $1/32$ grain each (the equivalent of $\frac{1}{4}$ grain of morphine each), nine doses of phenobarbital and one dose of nembutal. These medicines were intended to induce sleep and relieve pain. And she was given other medicines.

The contract was signed about 3:00 p.m. on Thursday. On that morning at 9:30, Miss Banning was given a dose of phenobarbital, and at 12:45 p.m. she was given $\frac{1}{8}$ grain of morphine. At 4:10 p.m., soon after the signing of the contract, she was given $\frac{1}{8}$ grain of morphine.

The deed was signed at about 2:30 o'clock p.m., on Saturday. Dr. Bradley was called at noon. At 12:20 p.m. she was given a dose of medicine prescribed by Dr. Bradley. At 1:20 p.m. she was given a vitamin brown tablet. Soon after the signing of the deed she was given a dose of phenobarbital.

The attending physician, Dr. Bradley, and the two nurses, Miss Hull and Miss Baubien, were in better position to know her actual condition than were the other witnesses, and they were positive that she was in a stupor much of the time, largely as a result of taking the sedatives and narcotics, and that she was nervous and restless most of the time, and that she was unable to comprehend the nature and effect of the contract and deed. Miss Hull

thought that she could possibly understand the words of the contract but not its meaning.

The majority opinion states that Miss Banning called Mr. Hogan on the morning after she was stricken and asked him to have the contract brought out for her to sign. In view of her ·critical condition that morning, it is more probable that some one interested in getting the contract signed called Mr. Hogan, as argued by the appellant. This was within 24 hours after she suffered the heart attack, and she was so ill that morning that Dr. Smith prevailed upon the hospital authorities to give her a private room, which was done.

That Miss Banning was in no condition, physical or mental, to execute the instruments is shown by the testimony of Mrs. Hayes, a witness for the University, that it irritated her (Mrs. Hayes) for them to present the instruments to Miss Banning for her to sign, in view of her condition, and that Miss Banning became very nervous after signing the deed, and asked Mrs. Hayes if she thought she had done the right thing and if she thought Sophia would approve of the gift. This shows that she should have had independent advice at the time she signed the deed. That she did not know what she had signed on Thursday is shown by the fact that on Saturday she asked Swisher to find out what she had signed, and she then stated that "they made me sign it."

According to the testimony of the defendant, it was tentatively agreed at the conference on Tuesday before she was stricken that Mr. Lytle would prepare a contract and will to re-arrange her affairs. The will was never presented to her, so that the tentative agreement was not fully carried out. The record does not disclose why the will was not presented to Miss Banning at the time the contract was presented to her.

The rules of law that, under the record, should cause a reversal of the judgment are as follows:

1. An action for cancellation of instruments is one of equitable cognizance, and on appeal from a judgment in such an action this court will weigh the evidence and reverse the judgment if it is clearly against the weight of the evidence. Hogan v. Leeper, 37 Okla. 655, 133 P. 190.

2. "The test of capacity to make a deed or conveyance is that the grantor shall have the ability to understand the nature and effect of the act *at the time* the conveyance is made." Antle v. Hartman, 193 Okla. 524, 145 P. 2d 756.

3. "It is settled law that where there is a great weakness of mind in a person executing a conveyance of land, arising from age, sickness, and any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party or his representatives or heirs, interfere and set the conveyance aside." Powell, Adm'r, v. Hughes, 189 Okla. 241, 116 P. 2d 896.

4. "Where an aged grantor, in the last hours of her life, executes a conveyance purporting to convey her entire estate without any, or grossly inadequate, consideration, to a stranger to the blood of the grantor, a court of equity will presume that the grantor did not appreciate the consequences and effect of the grant, and the burden is cast upon the claimant under the conveyance to overcome this presumption by showing that the grantor had the benefit of proper, independent advice concerning the proposed grant."

"And, 'proper, independent advice,' in this connection, means that the grantor had the benefit of previously conferring privately and fully with reference to the proposed grant, with a person disassociated from the interests of the grantee and competent to properly and impartially advise such grantor of the consequences and effect of the proposed grant." Zwirtz v. Dorl, 123 Okla. 284, 253 P. 75.

In view of the principles of law just

stated and the evidence above briefly summarized, it is my opinion that Miss Banning was not mentally competent to understand the nature and effect of the contract and deed at the time they were signed; that, in any event, she should have had the benefit of competent independent advice, in private, *at the time* she was asked to sign them, as to the effect and wisdom of signing them, but that she had no such advice; and that the contract and deed should be set aside.

For the foregoing reasons, I respectfully dissent.

OSBORN, J., concurs.

RILEY, J. (dissenting). The deceased, Miss Banning, acquired much of the estate conveyed to defendant in error without an adequate consideration, as a result of the devise of a mutual will of a previously deceased sister.

The mutual provisions of the wills of the Banning sisters provided that in event the primary devisee was deceased at the death of the testator, the estate devised would go to relatives of the testators. Therefore, since the sister of Miss Banning had predeceased her, there could be no doubt as to the devisees of Miss Banning's unrevoked, and I think, effective, irrevocable will. Since Miss Banning's estate was impressed with a trust, whether she, at the time of the conveyance of her estate in trust for Oklahoma City University, was competent or incompetent, or whether she received or did not receive independent legal advice, is immaterial.

As a contracting party, she could not divest, by gift, the estate, the legal title to which was in her name, because she was bound by the rule that a trustee and therefore a debtor must be just before being generous.

This cause is not briefed upon this proposition, but the facts stated are to be gleaned from the record, and judges are presumed to know the law. The law is expressed in the case of Paull v. Earlywine, 195 Okla. 486, 159 P. 2d 556, and Lewis v. Lewis, 104 Kan. 269, 178 P. 421. Moreover, by rule of this court, when petitions for rehearing were restricted in scope, it was proper practice to "show that the decision is in conflict with an express statute or controlling decision to which the attention of the court *was not called either in brief or oral argument . . ."* Certainly then, if a rule of law, a statute, or a decision will ultimately control the judgment of the court, the court, in the exercise of its discretion, may as well presently give the matter consideration; and if the justices are not conversant with the controlling rule of law or decision, the court might, if not to be aided by one of its own members, call upon the parties to brief the particular matter.

The majority opinion in the Earlywine Case was based on a will considered by the court as revoked because it had been lost and presumptively destroyed. In the case at bar there was not an effort at revocation and no presumption of revocation of Miss Banning's will arises, but by the conveyance of her estate there is an attempt to avoid, by gift, that which in fact was the res of a trust. The trust was impressed by the consideration and mutuality in the execution of the sisters' wills.

Mutual wills, made in consideration of reciprocal gifts or devises, partake of the nature of both a will and a contract. The execution of such wills evidences an understanding and a contract in pursuance of which the wills are made. The rule supported by the better reasoning and weight of authority is that if such a will has been made and one of the parties dies and the other accepts benefits thereunder, the survivor cannot thereafter revoke her will; and if such a will be considered revoked, nevertheless the contractual effect of the mutual wills remains.

If the will of Miss Banning could not be revoked, or if the revocation provided by statutes as to wills in general would not afford a means of destroying the contract evidenced by such wills, devolution of the estate vested by legal title in Miss Banning could not be defeated by a gift based on no sufficient consideration or by conveyance of any character except to innocent purchasers for value without notice of the defect, by which the estate was impressed with a trust.